[Cite as *State v. Perdue*, 2026-Ohio-2990.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

JOSHUA GLEN PERDUE,

    DEFENDANT-APPELLANT.

CASE NO. 14-25-15

OPINION AND
JUDGMENT ENTRY

Appeal from Union County Common Pleas Court
Trial Court No. 2024-CR-0121

Judgment Affirmed

Date of Decision: August 3, 2026

APPEARANCES:

    *L. Scott Petroff* for Appellant

    *Raymond Kelly Hamilton* for Appellee

**MILLER, J.**

{¶1} Defendant-appellant, Joshua G. Perdue ("Perdue"), appeals the March 28, 2025 judgment of sentence of the Union County Court of Common Pleas. For the reasons that follow, we affirm.

*Background*

{¶2} This case arises from a June 7, 2024 incident in which Perdue brandished and pointed a gun at his estranged wife, Bethany Perdue ("Bethany"), during a birthday party for Perdue's 11-year-old daughter. Bethany feared for her life and a struggle ensued, witnessed by the couple's children and the children attending the birthday party. Bethany escaped and fled to a neighbor's home. Soon thereafter, deputies arrested Perdue for driving under the influence of alcohol.

{¶3} On June 14, 2024, the Union County Grand Jury indicted Perdue on seven counts: Count One of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony; Count Two of felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony; Count Three of kidnapping in violation of R.C. 2905.01(A)(3), a first-degree felony; Count Four of domestic violence in violation of R.C. 2919.25(A), a first degree misdemeanor; Count Five of aggravated menacing in violation of R.C. 2903.21(A), a first-degree misdemeanor; Count Six of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(D)(1), a fifth-degree felony; Count Seven of operating a motor vehicle

under the influence of alcohol, a drug of abuse or a combination of them ("OVI") in violation of R.C. 4511.19(A)(1)(a), a first-degree misdemeanor. Counts One and Three included a three-year firearm specification pursuant to R.C. 2941.145(A).

{¶4} Perdue appeared for arraignment on June 20, 2024 and entered not-guilty pleas. A superseding indictment was issued on December 13, 2024, which was identical to the original indictment with the addition of a firearm specification pursuant to R.C. 2941.145(A) in relation to Count Two. On December 19, 2024, Perdue entered a not guilty plea to the charges in the superseding indictment.

{¶5} A jury trial was held on February 3, 4, 5, and 6, 2025. At the conclusion of the trial, the jury found Perdue not guilty of Count One (felonious assault) and Count Three (kidnapping). However, the jury found Perdue guilty of Count Two (felonious assault) and the attendant firearm specification, Count Four (domestic violence), Count Five (aggravated menacing), Count Six (improperly handling firearms in a motor vehicle), and Count Seven (OVI). The trial court accepted the jury's verdict and continued the matter for sentencing.

{¶6} On March 28, 2025, the parties appeared for sentencing. The trial court found that Counts Two, Four, and Five merged for sentencing, and the State elected for the court to sentence Perdue on Count Two. The trial court sentenced Perdue to 3 years in prison on the firearm specification associated with Count Two, an indefinite term of 4 to 6 years in prison on Count Two, 12 months in prison on Count Six, and 3 days of local incarceration on Count Seven. The court ordered the

sentence for the firearm specification to be served prior to and consecutive to the 4 to 6 year sentence imposed for Count Two. The remaining sentences were ordered to run concurrently to this term for an aggregate of 7 years to 9 years in prison.

{¶7} On April 8, 2025, Perdue filed a notice of appeal. He raises seven assignments of error which we address out of order, in a manner that facilitates our analysis.

**Seventh Assignment of Error**

**The conviction was against the manifest weight of the evidence and based upon insufficient evidence in violation of Appellant's right to due process as guaranteed by the United States Constitution and Ohio Constitution.**

{¶8} In his seventh assignment of error, Perdue challenges his conviction for felonious assault in violation of R.C. 2903.11(A)(2). Perdue contends that his conviction was based on insufficient evidence and is against the manifest weight of the evidence.

*Standards of Review*

{¶9} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address the sufficiency of the evidence and manifest weight legal concepts individually.

{¶10} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at

trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 2013-Ohio-4775, ¶ 33 (1st Dist.).

{¶11} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reserved and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the

conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

*Perdue's Offense*

{¶12} Perdue was convicted of felonious assault in violation of R.C. 2903.11(A)(2). A person commits felonious assault when he or she knowingly causes or attempts to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(2). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A defendant need not foresee the exact consequences of his actions"; "'[t]o be actionable, it is only necessary that the result is within the natural and logical scope of risk created by the conduct.'" *State v. Hathorn*, 2023-Ohio-3936, ¶ 28 (3d Dist.), quoting *State v. Taylor*, 2019-Ohio-3437, ¶ 46 (12th Dist.); *see also State v. Conway*, 2006-Ohio-791, ¶ 143 (it is a fundamental principle that a person is presumed to intend the natural, reasonable, and probable consequences of his voluntary acts).

{¶13} A firearm is an inherently dangerous instrument, the use of which is likely to produce death. *State v. Seiber*, 56 Ohio St.3d 4, 14 (1990). The trier of fact may infer the existence of the attempt to cause physical harm element from all of the circumstances that accompany the act of aiming of the deadly weapon at another. *State v. Peters*, 2023-Ohio-4362, ¶ 14 (3d Dist.); *State v. Potts*, 2016-Ohio-

5555, ¶ 53 (3d Dist.). Physical harm to persons is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

*Trial Testimony*

{¶14} Bethany testified that on June 7, 2024, she was hosting a birthday party for Perdue's daughter, Olivia. At the time, she and Perdue were separated and in the process of ending their marriage and had signed paperwork to that effect the night before. Perdue had been at the house earlier on the day of the party to mow the lawn, but left at some point, and missed the cake and his daughter opening her presents.

{¶15} Perdue returned to the house and, at that time, Bethany stated that "the whole room felt like it got dark" with the dog hiding and the kids scattering. (Feb. 4, 2025 Tr. at 174). Bethany recalled Perdue "staring at [her] . . . really oddly" and kept asking to talk to her. (*Id.*). Bethany refused, saying that it was a birthday party, and tried to keep herself busy but he "kept following [her] around." (*Id.*). Bethany testified that she could tell that Perdue had been drinking.

{¶16} Bethany stated that because Perdue was making her uncomfortable, she told him that she would meet him outside to hear what he had to say, and that she surreptitiously began video recording with her cell phone.

{¶17} Bethany testified that she went upstairs to retrieve an item from her bedroom and Perdue followed behind her and closed the door. Then, he drew a gun

from his pocket and pointed it at her, causing her to fall to her knees and scream. Bethany stated that she attempted to crawl into her closet and close the door behind her, but Perdue followed her. She repeatedly screamed and implored Perdue to spare her life.

{¶18} Bethany stated that she took self-defense classes in the past and recalled her instructor telling the class that if they are in a violent situation they should not do what the aggressor says. Accordingly, Bethany attempted to keep moving so that Perdue could not aim the gun at her forehead. Bethany stated that she was trying "to throw him off because I know he appreciates a clean, quick kill from hunting and animals and working in Hospice and I knew, if I made it so that [the shot] wasn't going to be perfect, that he wouldn't pull the trigger I was hoping." (Feb. 4, 2025 Tr. at 188).

{¶19} Bethany recalled that during the attack, Perdue restrained her and pressed the barrel of the gun against her forehead. She also tried to get her hand on the gun "[t]o distract him and throw him off his game" and to try to take the gun from him. (*Id.* at 189). She recalled that her finger was on Perdue's finger, which was on the trigger of the gun.

{¶20} State's Exhibit 4, Bethany's recording of the incident, was played for the jury. In the recording, Bethany could be heard telling Perdue that she would speak to him in a moment. Then, she appears to enter a different room, her bedroom, and the sound of a door closing can be heard. Moments later, Bethany begins

screaming and begging for her life. During the ensuing struggle, the phone falls onto the floor, but a glimpse of Purdue pointing the gun can still be seen. State's Exhibit 1, a still photograph of Perdue pointing his gun with his finger on the trigger was shown to Bethany. She testified that, in that photograph, Perdue was pointing the gun at her forehead while she was on the ground. Bethany recalled Perdue pointing the gun at her for the entirety of the struggle, which according to the video timestamps, lasted several minutes.

{¶21} Throughout the struggle, Bethany could be heard repeatedly asking Perdue to stop, reminding Perdue that she is a human being and mother, and screaming for help. Bethany stated the reason that she was begging for her life was because she thought that Perdue was going to kill her the same way that he killed feral goats and their dog, Sampson, "with a bullet right in the middle of my head." (Feb. 4, 2025 Tr. at 185). She testified that she cried out in prayer to the Holy Trinity because she thought Perdue was going to kill her.

{¶22} At some point, the partygoers, including Bethany's children and Perdue's daughter, opened the door and witnessed the events inside the bedroom. Bethany called out for the children to call the police and to run to the neighbor's home for safety. Bethany stated that she eventually was able to get out of the room and that, when she did, she ran faster than she ever had before. She recalled that upon leaving the house, she "army crawled" into a nearby field, terrified that Perdue

would shoot her from the bedroom window. A short time later, she was able to seek shelter at her neighbor's house with her children, Cole and Ella.

{¶23} State's Exhibit 3, Deputy Phelan's body-worn camera footage, was played for the jury. The footage depicts Bethany and her children at the neighbor's house. At the time deputies arrived, Bethany and Cole had their heads bowed together in prayer. Without prompting, Cole stated, "I know what happened. So he had . . . this tiny gun that he had in his hand. It was pointed at my mom's face." The video depicts Bethany realizing that her phone was still in the house in the bedroom and that she was recording when the incident occurred. Bethany confirmed at trial that she was in shock and had forgotten that her phone was recording. When she learned that her phone had recorded the incident, Bethany began jumping up and down in "relief" because she knew Purdue to be a liar and she was relieved that she had evidence of what happened.

{¶24} Perdue testified in his own defense. He testified that in June 2024, he and Bethany were in the process of ending their marriage. Perdue stated that during the last year of their marriage, he and Bethany drank regularly with each of them consuming 8 to 12 alcoholic drinks daily. Perdue stated that in December of 2023, the relationship had become so "toxic" that he moved into the basement to "[c]reate distance" and "avoid the confrontation." (Feb. 5, 2025 Tr. at 169).

{¶25} According to Perdue, he enjoyed hunting and owned a number of firearms, including the 0.380 Smith and Wesson and 0.40 caliber Smith and Wesson

at issue in the instant case. Perdue recounted an incident where he euthanized a sick goat and dog by shooting them in the head. He also recalled a story of Bethany being kicked in the head by a goat, resulting in her being treated for a concussion.

{¶26} Perdue confirmed that on June 6, 2024, that the day prior to the incident, he and Bethany met at the bank to sign and have their Separation Agreement notarized. Prior to going into the bank, the pair sat inside Bethany's car and drank wine together and had a "good" and "emotional" conversation. (Feb. 5, 2025 Tr. at 187). Perdue stated that they planned to get together later that evening to have sex. That evening, when they were at Bethany's house, he recalled that Bethany began talking about a date she was having the following morning, which made Perdue feel "not great." (*Id.* at 192). Perdue testified that her comments about the upcoming date caused him to leave the house angrily.

{¶27} On June 7, 2024, Perdue arrived at the house around noon to mow the grass before the party and finished around 3:00 p.m. After mowing the lawn, Perdue and Bethany spoke about her breakfast date that morning, which Bethany reported went well. Perdue testified that the conversation caused him to feel frustrated and hurt and that he left the house because of the "tension." (*Id.* at 202). Perdue recalled that during the time that he was at the house in the afternoon, he consumed approximately ten beers.

{¶28} According to Perdue, he returned to the house around 5:30 p.m. and was disappointed to learn that his daughter had already opened her birthday presents

and eaten cake. Perdue stated that he and Bethany had a conversation in the garage and she expressed that she was upset with him for missing the cake and presents and told him that he was a "terrible dad" who does not "deserve [his] kids" and that "this place would be better off without [him]." (*Id.* at 205).

{¶29} At that time, Perdue went to his truck to retrieve his gun. Perdue claimed that his "plan wasn't to harm anybody." (Feb. 5, 2025 Tr. at 207). Perdue testified that his intention was to "take the gun to give it to Beth . . . and tell her that . . . if you really feel this poorly of me or if you feel this way about me, then . . . you do it." (*Id.*). Perdue admitted that he did not actually think that Bethany would try to shoot him, but that he wanted to "get a reaction [from] her" and wanted to "hear her say that she did not mean" the comments that she made in the garage. (*Id.* at 210).

{¶30} Perdue claimed that when he retrieved the gun from the center console of his vehicle, he cleared the chamber to ensure there was not a live round there and put the magazine back in. He testified he did this so the gun would not be operable and so that she could not fire the gun.

{¶31} According to Perdue, when he reentered the house, he told Bethany he wanted to talk to her, and she asked him to wait for a minute. Perdue stated that some time passed and he was trying to be patient, but he started to think that Bethany did not want to talk to him. So when she went upstairs to her bedroom, he followed her inside and shut the door behind them.

-12-

{¶32} Perdue testified that he planned to remove his gun from his pocket, hand it to her, and tell her that if she wanted him gone, she was going to have to do it. However, Perdue stated that when he pulled the gun out of his pocket, Bethany immediately dropped to the floor. Perdue stated that her reaction caused him to freeze, but then when Bethany attempted to back her way into her closet, he followed her. Perdue claimed he did not anticipate the screaming and the reaction. He admitted that he could have turned around and walked out of the room, but he "froze" and "panicked." (Feb. 5, 2025 Tr. at 215-216). Perdue stated he did not recall pointing the gun at Bethany, but he admitted the still photograph from the recording "looks like that." (*Id.* at 216).

{¶33} Perdue claimed that while Bethany was in the closet, he dropped the gun to his side. According to Perdue, Bethany stood up and walked out of the closet and, at that point, Bethany grabbed hold of Perdue and the gun and was yanking and holding onto the gun. Perdue recalled that she had "a death grip on it with both hands. One hand she's hanging onto it. One hand she's moving all over the place. I think she was trying to pull - - pry my hands off of it." (Feb. 5, 2025 Tr. at 218).

{¶34} When asked why he did not just let go of the gun and walk about of the door, Perdue stated, "I wasn't going to let go of the gun." (*Id.* at 221). He claims that after they "struggled" for a minute, Bethany let go of the gun and left. (*Id.*).

{¶35} Perdue denied striking Bethany with his hands or with the gun. Perdue specifically denied pressing the barrel of the gun against her forehead. He admitted

there were times during the struggle that the gun was close to Bethany, but he denied he was aiming it at her.

**{¶36}** Perdue recalled that after Bethany left the room, he left the house and drove away in his truck. Perdue testified that, a short time later, he was pulled over by a law enforcement officer. Perdue admitted he was not truthful with the officer, telling him that Bethany had a weapon and he wrestled it away from her because he was "intoxicated" and "afraid." (Feb. 5, 2025 Tr. at 228).

**{¶37}** When confronted with the still photograph of himself holding the gun, he admitted his finger is on the trigger and that the gun was pointed downward at a person. He further admitted he would not want a firearm pointed at him in that way and stated it could cause somebody to be afraid.

**{¶38}** On cross examination, Perdue stated that Bethany dropped to the floor before he pointed the gun but admitted that he "exacerbated or intensified the situation by then bringing the gun up . . . and [having his] right hand extended as she's grounded in the closet." (Feb. 5, 2025 Tr. at 267-268). When asked about Olivia's statement to the deputy that he was pointing the gun at her stepmom, Perdue stated "she thinks that she saw that, yeah, but that's not what she saw." (*Id.* at 270). Similarly, when confronted with Cole's testimony that he saw Perdue point a gun at his mom's head, Perdue said, "I'm sure he thinks he saw that but that's not what I was doing." (*Id.* at 271).

*Sufficiency of the Evidence*

**{¶39}** Perdue challenges the sufficiency of the evidence supporting his felonious assault conviction. He loosely argues that the State failed to produce sufficient evidence to show that he attempted to cause harm by means of a deadly weapon.

**{¶40}** In support of his argument, Perdue alleges that the act of pointing a gun at a victim, without additional evidence, is insufficient for a conviction for felonious assault. *See State v. Brooks*, 44 Ohio St.3d 185 (1989) ("[t]he act of pointing a deadly weapon at another, without additional evidence regarding the actor's intention, is insufficient evidence to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11(A)(2)"). Perdue also implies that because he did not shoot Bethany, physically strike her with the gun, or make any threats, that his conduct amounts only to aggravated menacing. We disagree.

**{¶41}** The defendant's intention to cause physical harm may be inferred, not just from his words, but also from his conduct and the other circumstances surrounding his pointing a deadly weapon at another. "'While merely pointing a gun at another will not support a felonious-assault conviction, "the *Brooks* holding is that the trier of fact may infer the existence of [the attempt to cause physical harm] element from the circumstances that surround, and indeed prompt, the aiming of the deadly weapon."'" *Potts*, 2016-Ohio-5555, at ¶ 53, quoting *State v. Dyer*, 2015-

Ohio-451, ¶ 1 (2d Dist.), quoting *State v. Mills*, 1990 Ohio App. LEXIS 5437, *5 (1st Dist. Dec. 12, 1990).

{¶42} Purdue's conduct well exceeded that necessary to commit aggravated menacing. Bethany's testimony, supported by the video evidence, establishes that Perdue arrived at his daughter's birthday party intoxicated and demanded to speak to Bethany. Bethany stated that Perdue asked to speak to her and she told him that she would speak to him outside, however, Perdue started following her around the house. Sensing danger, Bethany surreptitiously began recording on her cell phone. Bethany testified that when she went upstairs to her bedroom to retrieve an item, Perdue followed her, uninvited, closed the door behind him, drew a firearm and pointed it at her. Bethany immediately screamed and pleaded for her life. Bethany fell to her knees as Perdue continued to point the gun at her.

{¶43} Bethany testified that when she saw the gun she "jumped down and [crawled into] the closet to try to shut the door" but Perdue "got in [the closet] and landed on top of me." (Feb. 4, 2025 Tr. at 188). Perdue grabbed hold of Bethany and pressed the gun into her forehead, causing Bethany to plea for her life reminding Purdue that she was a human being and a mother. Yet, Perdue continued to point the gun at her forehead.

{¶44} Bethany testified that in a bid to save her life, she attempted to "distract [Perdue] and throw him off his game" and "[t]o move [the gun]" and "survive." (*Id.* at 189). A struggle ensued during which Bethany attempted to wrestle the gun away

from Perdue. Bethany testified that she placed her thumb in the trigger guard to prevent the firearm from discharging and to try to take the gun away from Perdue. The video recording of the encounter indicates that Perdue informed Bethany that the trigger was in danger of moving and discharging the firearm by repeatedly saying "trigger." When asked how long Perdue placed the gun on Bethany's forehead, she testified that it "felt like way longer but a few minutes." (*Id.*).

{¶45} Bethany pleaded for her life, praying to the "Father, Son, [and] Holy Spirit." (*Id.* at 186). Bethany testified that she uttered those words during the encounter because "[Perdue's] eyes were black and I thought I was going to die and he [Father, Son, Holy Spirit] saw I was [about] to die and I wanted to go to heaven." (*Id.*).

{¶46} Partygoers, including Bethany's children and Perdue's children, heard the commotion and observed the situation. Bethany, fearing that Perdue was going to shoot her, instructed the children to run to the neighbor's house for safety and to call 911. Perdue's daughter, Olivia, called 911 telling the operator that her father was pointing a gun at her stepmother. In the background, Perdue's daughter could be heard attempting to comfort a frantic partygoer, telling the girl "you are not going to die." (State's Ex. 1). Bethany's daughter, Ella, also called 911, explaining that her stepfather was pointing a gun at her mother.

{¶47} Bethany testified that at some point during the encounter, she got free and she ran away faster than she had ever run in her life. She testified that she ran

into the field and crawled away from the house, afraid that Perdue would shoot her through the window.

**{¶48}** Bethany testified to the ongoing fear and terror she felt as a result of the incident. She testified she had difficulty sleeping, having "night terrors," and was treated for acute PTSD as a result of the incident. She also complained of generalized body pain, including to her head, from the incident.

**{¶49}** When viewed in a light most favorable to the State, we find that, under the facts presented in this case, sufficient evidence exists to support Perdue's conviction for felonious assault.

**{¶50}** Here, Perdue's conduct consisted of acts beyond merely displaying the gun. *Potts*, 2016-Ohio-5555, at ¶ 58. When viewed in a light most favorable to the State, the evidence established that Purdue went beyond merely pointing the gun at Bethany. Perdue chased her with the gun when she attempted to retreat, including pinning down her body and pointing the gun to her forehead. Bethany, fearing for her life, attempted to thwart Perdue's attempt to get a clean shot at her forehead by attempting to wrestle the gun away from him. Bethany testified that the struggle continued for several minutes, until she was able to break free and run away. *See State v. Ross*, 2004-Ohio-3093, ¶ 24 (2d Dist.) (upholding a conviction for felonious assault and holding that "the factual circumstances of this case, including the physical scuffle between the police and Ross over closing the door, the repeated act of pointing the laser aimed gun at [the victim's] chest while making eye contact with

the officer, and Ross's staunch refusal to drop the gun or even cease pointing it at the officer despite being cornered and the police's repeated orders to do so, amount to sufficient evidence in this case that Ross was attempting to cause physical harm to Officer Copley"). Accordingly, we reject Perdue's argument that his felonious-assault conviction is not supported by sufficient evidence.

*Manifest Weight*

{¶51} Having determined that sufficient evidence supported Perdue's conviction for felonious assault, we next turn to his contention that his conviction is not supported by the weight of the evidence. However, Perdue's brief does not make arguments directly relating to the weight of the evidence, arguing instead that the State's evidence was legally insufficient.

{¶52} However, to the extent that Perdue is arguing that the jury lost its way by believing Bethany's version of events over his own, we reject his argument. "A verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's [evidence] rather than the defendant's version of the events." *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.). "'Although we review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily a determination for the trier of fact.'" *State v. Cox*, 2022-Ohio-571, ¶ 20 (3d Dist.), quoting *State v. Banks*, 2011-Ohio-5671, ¶ 13 (8th Dist.), citing *DeHass*, 10 Ohio St.2d at paragraph one of the syllabus. "'The trier of fact is best able "to view the witnesses and observe their demeanor, gestures[,] and voice

inflections, and use these observations in weighing the credibility of the proffered testimony."'" *State v. Brentley*, 2023-Ohio-2530, ¶ 33 (3d Dist.), quoting *Banks* at ¶ 13, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80-81 (1984).

{¶53} Notably, the jury had the opportunity to view the video and audio recording of the event as well as the deputy's body-worn camera footage of Bethany, her children, and the other witnesses. The jury also had the opportunity to observe the testimony of the witnesses, including Bethany and Perdue, to determine the credibility and weight of the evidence presented at trial. "[I]t is within the province of the jury to parse out the credible portions of witnesses' testimonies." *State v. Waller*, 2023-Ohio-493, ¶ 20 (3d Dist.). The record sufficiently supports the jury's credibility assessments, and we find no basis to alter its analysis. *See State v. Reillo*, 2026-Ohio-2701, ¶ 38 ("[W]hen conducting a manifest-weight review, appellate courts must defer to the fact-finder's witness-credibility determinations. . . Since [the victim's] credibility was not clearly undermined, Reillo's convictions are not against the manifest weight of the evidence.").

{¶54} Having examined the record, we do not conclude that the jury lost its way when it returned guilty verdicts with respect to the felonious assault charge. Accordingly, we overrule Perdue's seventh assignment of error.

## First Assignment of Error

**Appellant's due process rights were violated when the trial court allowed the State to question Appellant about the invocation of his rights, in violation of both the Ohio and United States constitutions.**

{¶55} In his first assignment of error, Perdue argues that the trial court erred by permitting the State to question him regarding his reasons for not providing an exculpatory explanation to law enforcement and about his invocation of his right to an attorney.

*Relevant Law*

{¶56} The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." This provision is applicable to the States through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489 (1964). "The Fifth Amendment guarantees a criminal defendant's right against self-incrimination, which includes the right to silence during police interrogation." *State v. Harper*, 2012-Ohio-4527, ¶ 32 (4th Dist.), citing *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602 (1966). "'Once a person invokes his or her Fifth Amendment right to remain silent, the State cannot use the person's silence [either in arrest or postarrest circumstances] as substantive evidence of guilt in its case-in-chief.'" *State v. Cooper*, 2020-Ohio-4293, ¶ 18 (8th Dist.), quoting *State v. Bennett*, 2014-Ohio-160, ¶ 63 (9th Dist.), citing *Wainwright v. Greenfield*, 474 U.S. 284, 298-299, 106 S.Ct. 634 (1986).

*Application*

{¶57} Perdue objects to the following line of questioning on cross-examination:

[State]:          Mr. Perdue, you have testified today, under oath, that you are an admitted liar. Is that correct?

[Perdue]:       I - - yeah, I said that I lied.

[State]:          And it's my understanding that you heard my opening statement. Is it correct that you brought a gun to your daughter's birthday party?

[Perdue]:       Yes, that's accurate.

[State]:          And did you tell Beth Perdue that that gun was not loaded when you went upstairs?

[Perdue]:       I didn't tell her anything about the gun.

[State]:          And where were all these details that you just provided? Why didn't you share that with Officer or Deputy Trout when he pulled you over that day?

[Perdue]:       I'm not sure why I didn't share it. I wanted to talk to an attorney but - -

[State]:          You wanted to talk to an attorney because you had a consciousness of guilt, didn't you?

[Perdue]:       No, because - -

[Defense Counsel]: Objection.

[Perdue]:       - - I had charges against me.

[Defense Counsel]: Objection.

[Trial Court]:        Overruled.

[State]:        My question is this.  You wanted an attorney because you had consciousness of guilt?

[Perdue]:        No.

[State]:        When Deputy Trout was asking you questions, you didn't tell him the truth, did you?

[Perdue]:        That's accurate.  I did not.

(Feb. 5, 2025 Tr. at 232-233).

**{¶58}** Perdue contends that the above discussion, particularly the section referencing his request for an attorney because had "consciousness of guilt" is a violation of his Fifth Amendment and Due Process rights to such a degree that his convictions must be overturned.

**{¶59}** In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240 (1976), the defendants received *Miranda* warnings upon arrest.  At their separate trials, both defendants provided an exculpatory story that they did not previously give to the State or law enforcement.  The defendants were then, over objection, cross-examined regarding why they had not provided investigating officers or the State the exculpatory explanations provided at trial.  The United States Supreme Court reversed the defendants' convictions on the grounds that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619. "'[T]he

test under *Doyle* is to determine whether the prosecutor's comment was extensive – "whether an inference of guilt from silence is stressed to the jury . . ." as a basis of conviction.'" *State v. Rosa*, 2019-Ohio-4888, ¶ 37 (8th Dist.), quoting *State v. Lanier*, 1996 Ohio App. LEXIS 3286, 11 (6th Dist. Aug. 2, 1996), quoting *United States v. Newman*, 943 F.2d 1155, 1158 (9th Cir. 1991).

{¶60} Although a prosecutor is permitted to address perceived discrepancies between a defendant's statement to police and his testimony at trial, undoubtedly, the prosecutor's question relating to Perdue's request for an attorney and its implication regarding his consciousness of guilt was inappropriate and should not have been asked.

{¶61} However, applying the *Doyle* test, we find that although the State's question was inappropriate, in the context of the trial, we do not find that the prosecutor's statement was extensive such that an inference of guilt from silence is stressed to the jury as a basis of conviction. *See Rosa* at ¶ 37. As detailed in our discussion of the weight and sufficiency of the evidence, an overwhelming amount of evidence supports Perdue's convictions. The prosecutor's references to "consciousness of guilt" were so minor and oblique when compared to the overwhelming evidence against Purdue, as to be harmless beyond a reasonable doubt. Moreover, the jury found Perdue not guilty of several of the most serious charging pending against him, namely felonious assault in violation of R.C. 2903.11(A)(1) and kidnapping.

{¶62} Accordingly, Perdue's first assignment of error is overruled.

**Second Assignment of Error**

**The trial court erred when it failed to exclude the expert testimony where no expert report was provided and then instructed the jury about expert testimony.**

{¶63} In his second assignment of error, Perdue contends the trial court erred by not excluding expert testimony of Bethany's medical providers where no expert report was disclosed as required by Crim.R. 16(K). Perdue claims he was "ambushed by the testimony of medical professionals who [were] presented as a fact witness where they testified as to the causation of the victim's injuries when that information was not contained in discovery and the error was not cured, but compounded, by a jury instruction about expert witnesses." (Appellant's Brief at 11).

*Standard of Review*

{¶64} An appellate court reviews a trial court's admission or exclusion of evidence for an abuse of discretion. *State v. Finnerty*, 45 Ohio St.3d 104, 107 (1989). Additionally, an abuse of discretion standard applies to a trial court's decision to admit testimony under Evid.R. 701. *State v. Cook*, 2020-Ohio-3411, ¶ 39 (3d Dist.). A trial court abuses its discretion when its conduct is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9.

*Relevant Law*

**{¶65}** Evid.R. 701, the evidence rule governing opinion testimony by lay witnesses provides, "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. In assessing admissibility under this rule, the Supreme Court of Ohio has "recognize[d] the importance of sufficient familiarity with the substance to support the opinion." *State v. McKee*, 91 Ohio St.3d 292, 295-296 (2001). In other words, in considering the lay witness opinion testimony, the trial court must make "an initial determination that the witness possessed sufficient experience or specialized knowledge, thus satisfying the rule's requirements that the opinion be both 'helpful to a clear understanding . . . of a fact in issue' and 'rationally based' upon the witness's perception." *Id.* at 296. In accordance with this application of the rule, "courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *Id.*

**{¶66}** Conversely, Evid.R. 702 permits a witness to testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information[.]

Evid.R. 702.

Additionally, Crim.R. 16(K) provides that:

An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

**{¶67}** "'The line between expert testimony under Evid.R. 702 and lay opinion testimony under Evid.R. 701 is not always easy to draw.'" *State v. Salyers*, 2020-Ohio-147, ¶ 30 (3d Dist.), quoting *State v. Ndao*, 2017-Ohio-8422, ¶ 25 (2d Dist.). However, "[t]he Ohio Supreme Court has accepted the trend toward allowing lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *State v. Baker*, 2020-Ohio-7023, ¶ 35 (7th Dist.), citing *McKee* at 296. "Lay opinion based on personal knowledge and experience can fall within Evid.R. 701, even on a subject outside the realm of common knowledge." *State v. Martin*, 2024-Ohio-5332, ¶ 80 (7th Dist.). *See McKee* at 296-297, citing Evid.R. 701 ("If the witness is not testifying

as an expert, the witness' testimony in the form of opinions or inferences which are (1) rationally based on the perception of the witnesses and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.").

{¶68} "It is well established that treating physicians can be called at trial to testify as viewers of their patients' physical condition and not as experts retained in anticipation of litigation." *State v. Brofford*, 2013-Ohio-3781, ¶ 35 (3d Dist.). "Even if a treating physician's conclusion is considered to have ventured into the realm of expert opinion that should have been specifically added to the disclosed medical report, the alleged error is considered harmless where the defense was not taken by surprise and the ability to cross-examine the witness was not obstructed." *Martin* at ¶ 82. "In other words, Crim.R. 16 does not prohibit the reviewing court from conducting a harmless error analysis." *Id.*

*Analysis*

{¶69} Perdue contests the testimony of two treating medical professionals, Dr. Laura Wilkie (Dr. Wilkie) and Nurse Practitioner Amanda Lollini ("NP Lollini"). First, Perdue challenges the testimony of Dr. Wilkie, the emergency medicine physician who treated Bethany on June 8, 2024. At trial, Dr. Wilkie testified to her interactions with Bethany who described "the front of her head as achy and generalized pain all over." (Feb. 5, 2025 Tr. at 62). Dr. Wilkie recounted the medical care Bethany received when she presented to the emergency department. Additionally, the State asked Dr. Wilkie how she diagnoses a

concussion and what kind of information is needed to make that clinical diagnosis. The State then asked Dr. Wilkie if she was able to make a definitive determination regarding whether or not Bethany had a concussion. Dr. Wilkie responded she could not "definitively say that [she has a concussion]" but that "there certainly is a likelihood that [Bethany] had a concussion based on her symptoms." (*Id.* at 65). The State followed up with general questions regarding the treatment of concussions and the concept of shock.

{¶70} On cross-examination, defense counsel questioned Dr. Wilkie regarding concussion symptoms, including their duration. The defense also asked Dr. Wilkie questions regarding successive concussions, including the possibility that Bethany's symptoms resulted from an earlier concussion unrelated to the June 7, 2024 event. The defense also questioned Dr. Wilkie as follows:

[Defense Counsel]: [L]ooking at her physical harm, . . . to determine, ultimately if there's serious physical harm, do you think she had any harm that you observed that carried a substantial risk of death.

[Dr. Wilkie]: No.

[Defense Counsel]: Any permanent incapacity, whether partial or total, that involves some temporary substantial incapacity?

[Dr. Wilkie]: Um, I mean, I think it - - depending on [the] concussion, it can affect, you know, her daily living and activities. So, it is possible that [it] would go on to affect her.

[Defense Counsel]: And no physical injuries that would do that. Correct?

[Dr. Wilkie]: A, I believe, she just had . . . diffused bruising. So nothing in that regard.

[Defense Counsel]: And, in fact, her injuries weren't significant enough for you to even order an x-ray for any part of her body. Isn't that correct?

[Dr. Wilkie]: Um, yeah. I mean, [x-rays] are looking for fractures or dislocation. There was no . . . body deformity based on my exam.

[Defense Counsel]: So, there was no [x-rays] performed?

[Dr. Wilkie]: Correct.

[Defense Counsel]: In the musculoskeletal evaluation, you indicated there were small areas of bruising but she did have full range of motion in all joints and ambulating without difficulty. No bony deformity. Ambulating without means she could move?

[Dr. Wilkie]: [I]t means she could walk.

[Defense Counsel]: And she had full range of motion on all of her joints?

[Dr. Wilkie]: Correct.

(Feb. 5, 2025 Tr. at 72-73).

On redirect examination, the State questioned Dr. Wilkie as follows:

[State]: Now, [defense counsel] brought up something that was in the notes, the medical notes, about her being kicked in the head or having a concussions previously in the previous month or before?

-30-

[Dr. Wilkie]:        Yes.

[State]:             And then he asked you a question . . . trying to
                     say that one concussion really couldn't be
                     distinguished from the other concussion.
                     Correct?

[Dr. Wilkie]:        Yes.

[State]:             And so, ultimately, if you had a concussion on
                     May 1st, could it be exacerbated if you were then
                     hit in the head, again, on June 8th?

[Dr. Wilkie]:        Yes.

[State]:             And so, explain that exacerbation?

[Dr. Wilkie]:        For this patient?

[State]:             In general, and then for this patient.

(Feb. 5, 2025 Tr. at 75).

{¶71} Perdue takes issue with Dr. Wilkie's testimony on the grounds that she

"testified about more than just her observations."  (Appellant's Brief at 12).   In

particular, Perdue challenges the State's questions regarding concussions generally

and how she would diagnose a concussion, as well as the concept of shock, and the

State's questions regarding whether a concussion in May could be exacerbated by a

subsequent concussion in June.  Perdue contends that the challenged information is

a "hypothetical opinion that goes to a contested and central issue in the case" and

that the resulting information was not found in the medical record.

{¶72} Perdue also challenges the testimony of NP Lollini, Bethany's primary care provider. On January 28, 2025, Perdue filed a motion in limine to exclude NP Lollini's testimony on the grounds that the State failed to file a written report of expert witness testimony in accordance with Crim.R. 16(K). However, the trial court denied Perdue's motion in limine on the grounds that NP Lollini's testimony would be as a treating medical provider. The trial court specified that NP Lollini "can't give a hypothetical opinion" but is able to "give an opinion based upon her training and experience for examination and history and physical." (Feb. 5, 2025 Tr. at 54).

{¶73} Immediately prior to NP Lollini's testimony, counsel engaged in the following conversation outside the presence of the jury:

| | |
|---|---|
| [Defense Counsel]: | Can we . . . just clarify . . . . my understanding is you're not going to ask [NP Lollini] any opinion. Is that correct? |
| [State]: | I'm going to ask her what happened on June 11, 2024 [when she treated Bethany]. |
| [Defense Counsel]: | What she observed and what she did, I assume. |
| [State]: | As a fact witness, yes. |
| [Defense Counsel]: | Okay. |
| [State]: | What actions she took as a fact witness. |
| [Defense Counsel]: | I guess, we're getting close to the wording or how you ask it. But, if that's the case, |

[Trial Court]:          then I don't see an issue and, if it is, I'll object and we can approach.

. . .

[Trial Court]:          She can't give a hypothetical opinion. She can give an opinion as a treating physician of what her - - what she - - she diagnosed.

(Feb. 5, 2025 Tr. at 79-81).

{¶74} NP Lollini testified that Bethany has been her patient for five years. She then testified to her interactions with Bethany on June 11, 2024. She stated that Bethany had plans to establish care with a counselor pursuant to NP Lollini's recommendation. NP Lollini confirmed that she diagnosed Bethany with acute PTSD relating to the event and that she prescribed a medication to help manage her anxiety.

{¶75} Perdue complains that NP Lollini testified as an expert by offering a hypothetical opinion regarding the causation of the symptoms that she observed on June 11, 2024. Specifically, Perdue challenges NP Lollini's testimony that Bethany experienced acute PTSD that was caused by the event, and further, that Bethany had experienced similar anxiety symptoms in the past and that the events of June 7, 2024 could have worsened her symptoms.

{¶76} As an initial matter, we note that Perdue's arguments relate to the medical practitioners' testimony regarding the extent of Bethany's injuries,

specifically the possibility of a concussion and acute PTSD resulting from the incident.

{¶77} Initially, Perdue was charged with felonious assault (Count One) in violation of R.C. 2903.11(A)(1). That statute provides that "[n]o person shall knowingly . . . [c]ause serious physical harm to another[.]"

"Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(a)-(e).

{¶78} Importantly, the statements to which Perdue now attempts to assign error appear to have been elicited to relate to the "serious physical harm element." However, the jury found Perdue not guilty of felonious assault in violation of R.C. 2903.11(A)(1) (Count One). Accordingly, any error pertaining to the admission or exclusion of evidence relating to that element would be harmless.

**{¶79}** Perdue was convicted of felonious assault in violation of R.C. 2903.11(A)(2) (Count Two). The relevant statute provides that "[n]o person shall knowingly . . . [c]ause or attempt to cause physical harm to another . . . by means of a deadly weapon or dangerous ordnance." Accordingly, the State was not required to demonstrate that Perdue had actually caused physical harm in order to satisfy the elements of that offense. Further, the testimony provided by NP Lollini and Dr. Wilkie was inapplicable to the elements of Perdue's improperly handling firearms in a motor vehicle conviction or OVI conviction.

**{¶80}** Moreover, as addressed in our discussion of the sufficiency and weight of the evidence supporting Perdue's felonious-assault conviction, the evidence, including the video recording, still photographs, and the multiple eyewitness testimony of Perdue's actions on June 7, 2024 provide overwhelming evidence of Perdue's guilt, even with the exclusion of the treating medical provider's testimony. Accordingly, any error relating to the admission of the medical providers' testimony is harmless. *See Martin*, 2024-Ohio-5332, at ¶ 82.

**{¶81}** Furthermore, after reviewing the testimony to which Perdue assigns fault in the context of the trial, we do not find that the trial court erred by admitting the testimony of NP Lollini and Dr. Wilkie. As medical practitioners who treated Bethany, we find that the medical professionals' testimony was based on their observations of Bethany's conditions and the testimony at issue was helpful to give the jury a clear understanding of a fact at issue. *McKee*, 91 Ohio St.3d at 296-297.

Furthermore, Perdue's counsel had the opportunity to cross examine the providers and used this opportunity to attempt to refute the State's claims. *See Martin*, 2024-Ohio-5332, at ¶ 82. Thus, we do not find that the trial court erred by permitting the testimony of the two treating medical professionals.

**{¶82}** Accordingly, Perdue's second assignment of error is overruled.

### Third Assignment of Error

**The trial court acted unreasonably when it denied Appellant's motion for jury instructions and provided an instruction at the State's request that confused the jury.**

**{¶83}** In his third assignment of error, Perdue raises two main concerns with respect to the jury instructions. First, he alleges the trial court misled the jury by improperly instructing the jury on expert testimony where no expert testified and Perdue's counsel objected to the introduction of expert testimony. Second, he contends the trial court gave "confusing" instructions relating to Count Two (felonious assault).

*Standard of Review and Relevant Law*

**{¶84}** "Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder." *State v. Shine-Johnson*, 2018-Ohio-3347, ¶ 25 (10th Dist.). "Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction." *State v.*

*Adams*, 2015-Ohio-3954, ¶ 240. Yet, a trial court may refuse to issue a requested jury instruction if "'the evidence adduced at trial is legally insufficient' to support it." *State v. Juntunen*, 2010-Ohio-5625, ¶ 13 (10th Dist.), quoting *State v. Barnd*, 85 Ohio App.3d 254, 259 (3d Dist. 1993). "[T]he trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction." *State v. Fulmer*, 2008-Ohio-936, ¶ 72. "To be justified, a jury instruction must be based on an actual issue in the case as demonstrated by the evidence." *State v. Cunningham*, 2023-Ohio-157, ¶ 13 (2d Dist.). Accordingly, "[a] court reviewing a trial court's refusal to submit to the jury a requested instruction must determine whether the trial court's decision constituted 'an abuse of discretion under the facts and circumstances of the case.'" *Juntunen* at ¶ 13, quoting *State v. Wolons*, 44 Ohio St.3d 64, 68 (1989). An abuse of discretion is more than a mere error in judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

*Analysis*

{¶85} First, Perdue contends that the trial court erred by instructing the jury on expert witnesses where no expert witness testified. Specifically, the trial court instructed the jury as follows:

> Generally, a witness may not express an opinion. However, one who follows a profession or special line of work may express his or her opinion because of his or her education, knowledge, and experience.

-37-

Such testimony is admitted for whatever assistance it may provide to help you to arrive at a just verdict. There may have been questions asked in which an expert witness was permitted to assume that certain facts were true and to give an opinion based upon such assumptions. You must determine whether the assumed facts upon which the expert based his or her opinion are true. If any assumed fact was not established, you will determine its effect upon the opinion of the expert. As with other witnesses, upon you, alone, rests the duty of deciding what weight should be given to the testimony of an expert. In determining its weight, you may take into consideration the expert's skill, experience, knowledge, veracity, familiarity with the facts of the case and the usual rules for testing credibility and determining the weight to be given to testimony.

(Feb. 6, 2025 Tr. at 80).

{¶86} Perdue contends that this particular jury instruction was given in error because although the instruction specifically references an expert, the State denied that an expert witness testified at trial, no Crim.R. 16(K) report was provided, and Perdue objected to NP Lollini giving expert testimony.

{¶87} Perdue alleges that the jury instruction referencing an expert witness confused the jury because NP Lollini was not presented to the jury as an expert witness. According to Perdue, this apparent inconsistency served to compound the issues raised in his second assignment of error.

{¶88} Second, Perdue challenges a portion of the jury instruction given with respect to Count Two, felonious assault. Specifically, Perdue contests, the trial court's statement that:

As to Count Two, Ohio law states that the act of pointing a deadly weapon at another, coupled with evidence of an intent to use the weapon, is sufficient to prove all essential elements of Count Two.

-38-

(Feb. 6, 2025 Tr. at 95).

{¶89} Perdue contends that he did not make "explicit threats" to Bethany and, accordingly, it was improper for the trial court to issue the above instruction. Perdue alleges that, in light of the evidence adduced at the trial, the issued jury instruction was confusing for the jury. Rather, Perdue argues that the trial court should have instructed the jury that "The act of pointing a firearm at another person, without additional evidence of intent to cause physical harm, is insufficient to support a conviction for felonious assault."

{¶90} However, based upon the entire record, we do not find that the jury instructions were an abuse of discretion. First, with respect to Perdue's allegation that the trial court erred by referencing expert testimony, we find that any error in including the jury instruction is harmless.

{¶91} The rule for harmless error provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). The State bears the burden of demonstrating that the error did not affect the substantial rights of the defendant. *State v. Jones*, 2020-Ohio-3051, ¶ 18. "Whether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial." *Id.* If the trial court's error in instructing the jury "was harmless beyond a reasonable doubt," then we will not reverse the defendant's conviction on that basis.

*State v. Knuff*, 2024-Ohio-902, ¶ 197; *see also State v. Montgomery*, 2022-Ohio-2211, ¶ 25 (a constitutional trial error is harmless when the state demonstrates beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained); *State v. Noggle*, 140 Ohio App.3d 733, 749 (3d Dist. 2000) (involving erroneous jury instruction; to be deemed nonprejudicial, error of constitutional dimension must be harmless beyond a reasonable doubt). "An appellate court is required to reverse the conviction when the State is unable to meet its burden." *Jones* at ¶ 18.

{¶92} Perdue's arguments with respect to the testimony of NP Lollini and Dr. Wilkie relate to their testimony regarding the physical injuries suffered by Bethany during the incident, most notably testimony regarding concussions and PTSD, which relate to Count One (felonious assault in violation of R.C. 2903.11(A)(1)). However, the jury found Perdue not guilty of that offense. Accordingly, Perdue is not able to show that the error complained of prejudiced him. Any error with respect to the inclusion of the medical providers' testimony and the jury instructions related thereto are harmless.

{¶93} Furthermore, we reject Perdue's argument relating to Count Two. Our review of the record indicates that the evidence adduced at trial was sufficient to support the trial court giving the instruction. As detailed in our discussion of Perdue's argument relating to the sufficiency and weight of the evidence supporting Count Two, the evidence presented at trial supports an instruction that Perdue

pointed the gun at Bethany and gave strong indications of his intention to use the firearm. Accordingly, the trial court did not abuse its discretion by issuing the jury instruction at issue.

{¶94} Accordingly, Perdue's third assignment of error is overruled.

**Fourth Assignment of Error**

**The State committed prosecutorial misconduct by making inaccurate statements of law and personally attacking the credibility of defense counsel.**

{¶95} In his fourth assignment of error, Perdue argues that he was denied due process of law as a result of alleged prosecutorial misconduct. Specifically, Perdue contends that the prosecutor committed plain error by making improper statements during closing argument.

*Applicable Law*

{¶96} The test regarding prosecutorial misconduct in opening statements or closing arguments is whether the conduct or remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984) (involving closing argument); *State v. Nicholson*, 2024-Ohio-604, ¶ 266 (involving opening statement). "[I]t is not enough that there be sufficient other evidence to sustain a conviction in order to excuse the prosecution's improper remarks." *Smith* at 15. "Instead, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found [the] defendant guilty." *Id.*; *State v. Knuff*, 2024-Ohio-902, ¶ 238 (a conviction may

be upheld in the face of a prosecutor's improper remarks when it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the comment); *In re J.G.*, 2025-Ohio-1933, ¶ 48 (8th Dist.) (acknowledging that "the test for plain error and prosecutorial misconduct are essentially the same"). "'[T]he focus of an inquiry into allegations of prosecutorial misconduct is upon the fairness of the trial, not upon culpability of the prosecutor.'" *State v. McKelton*, 2015-Ohio-4228, ¶ 13 (12th Dist.), quoting *State v. Gray*, 2012-Ohio-4769, ¶ 57 (12th Dist.).

{¶97} When there is no objection at trial to the alleged prosecutorial misconduct, we review the issue for plain error. *Nicholson* at ¶ 281 (opening statements); *State v. Ballew*, 76 Ohio St.3d 244, 254-255 (1996) (closing arguments); Crim.R. 52(B). *See State v. White*, 82 Ohio St.3d 16, 22 (1998) ("Since defense counsel failed to object to the alleged instances of prosecutorial misconduct, the alleged improprieties are waived, absent plain error."). "To qualify for plain-error relief, the appellant must establish: (1) occurrence of an error, i.e., a deviation from a legal rule; (2) the error was plain, i.e., it was an obvious defect in the trial proceedings; and (3) the error affected the appellant's substantial rights, meaning the error 'must have affected the outcome of the trial.'" *State v. Cass*, 2024-Ohio-2614, ¶ 57 (3d Dist.), quoting *State v. Morgan*, 2017-Ohio-7565, ¶ 35. In other words, "a reversal for prosecutorial misconduct will not occur unless it is clear that the outcome of the trial would have been different but for the misconduct." *State v. Boles*, 2010-Ohio-5503, ¶ 50 (6th Dist.), citing *State v. Smith*, 14 Ohio St.3d 13, 15

(1984). Additionally, the decision to correct a plain error is discretionary and should be made with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Noling*, 2002-Ohio-7044, ¶ 62.

{¶98} In closing statements, "[t]he prosecution is normally entitled to a certain degree of latitude." *Smith*, 14 Ohio St.3d at 13-14 (identifying types of remarks to be avoided). A prosecutor may comment upon the evidence and suggest the conclusion to be drawn from it. *State v. Stevens*, 2016-Ohio-446, ¶ 71 (3d Dist.). However, "[a] closing statement that goes beyond the record may constitute prejudicial error." *State v. Moritz*, 63 Ohio St.2d 150, 157 (1980). "'A prosecutor's isolated comments are not to be taken out of context and given their most damaging meaning.'" *State v. Rasawehr*, 2020-Ohio-429, ¶ 13 (3d Dist.), quoting *State v. Encarnacion*, 2017-Ohio-5530, ¶ 10 (10th Dist.). "'Instead, an appellate court must review a closing argument in its entirety to determine whether prejudicial error occurred.'" *Id.*, quoting *Encarnacion* at ¶ 10. "'Important considerations are whether the misconduct was an isolated incident or a protracted series of improper arguments, whether the defendant objected, whether curative instructions were given, and whether the evidence of guilt was overwhelming.'" *State v. Norales-Martinez*, 2018-Ohio-4356, ¶ 32 (6th Dist.), quoting *State v. Oviedo*, 1997 Ohio App. LEXIS 3607, *4 (6th Dist. Aug. 15, 1997), citing *State v. Keenan*, 66 Ohio St.3d 402, 410 (1993).

*Analysis*

**{¶99}** Perdue argues that some of the statements made by the prosecuting attorney during closing arguments constituted prosecutorial misconduct and, accordingly, violated his due process rights.

**{¶100}** During closing arguments, the prosecutor started by discussing Perdue's testimony. The prosecutor specifically highlighted that Perdue admitted during his testimony that he brought a gun to a child's birthday party. The prosecutor also emphasized the inconsistencies between Perdue's version of events and the evidence adduced at trial. The prosecutor contrasted Purdue's testimony to the evidence and testimony presented by the State, which the prosecutor claimed was coherent, consistent, and compelling. The prosecutor then correlated the evidence presented at trial with the elements of the offenses. The prosecutor concluded his closing argument by playing the video that Bethany recorded of the incident and highlighting the screams and pleas for her life made by Bethany during the encounter.

**{¶101}** Perdue objects to several statements made by the State during closing arguments. First, during closing argument, the State chastised the defense's brief opening argument. The State held up a single page of paper that the prosecutor alleged were his notes from the defense's opening statement and criticized the brevity of the opening statement by saying:

> And, in fact, during their opening statement and part of the reason I made this Power Point and part of the reason I was so perplexed last night until I got here this morning was because this was my notes from their opening statement. This was it. One page. Nothing substantial. Nothing significant and nothing that they wanted to commit to at that particular moment other than they were saying he was drunk. But he had a gun. They were going to (inaudible) those two and that was it. They wanted to see how the rest of the evidence was going to play out. The State submits to you before they decided, perhaps, what they wanted to say.

(Feb. 6, 2025 Tr. at 24).

{¶102} Perdue alleges that the above statement accused defense counsel of lying.

{¶103} Perdue also challenges the prosecutor's subsequent comment, made during the State's rebuttal argument, responding to defense counsel's statement that while perhaps there may be enough evidence to find Perdue guilty of domestic violence, sufficient evidence was not presented to support the more serious crimes charged. Specifically, the prosecutor said,

> I want you to appreciate that. [Defense counsel] talking out both sides of his mouth. Find him guilty, perhaps, of Domestic Violence. You can't find him guilty of serious physical harm or physical harm under Count One and Two. That's incorrect. You can find him guilty of every single one of these charges.

(*Id.* at 71). Perdue claims this comment "serves no purpose other than to personally disparage a fellow attorney" and contends that "[s]uch conduct has no place in a court room." (Appellant's Brief at 20).

{¶104} Also, during closing argument, Purdue's defense counsel replaced the word "stealth" with "threat" when discussing the elements of the kidnapping charge. The prosecutor then referenced the error in his rebuttal by stating:

[Defense counsel] made some responses in [his closing] argument where he's simply wrong and I'm going to point those out. [Defense counsel] said, on page or Count Three, he made reference to the elements being force. He said stealth or deception.

I'm telling you right now. It is not force, stealth, or deception. It is force, threat, and deception. So, once again, we have something that the defense has tried to misdirect you with.

(Feb. 6, 2025 Tr. at 68).

The State continued by stating:

[Defense counsel], also, said that, if you believe - - this is in relation to Count Two - - if you believe that this physical harm by [banging] the head into the cupboard, then that is Domestic Violence but not Felonious Assault.

Recognize this. When we talk about Domestic Violence, which is on Page 7 [of the jury instructions] right there, it says cause any kind of physical harm to a family member. Then we go to Count Two, which is on Page 6 [of the jury instructions], makes it abundantly clear. It says cause or attempt to cause physical harm. Cause or attempt to cause physical harm.

Ladies and gentlemen, I submit to you that, if you find that there's Domestic Violence here, then that is sufficient for you to, also, find Count Two and find Josh Perdue guilty because he caused physical harm as they were struggling over a gun and that's what becomes so important here. It's not just banging your head. All while banging your head but I'm, also, pointing a gun.

He thinks that because the gun didn't go off that it's not a crime? It says cause or attempt to cause. Her getting her head banged into the cupboard as seen by Cole, that's cause of physical harm. And that's

causing the kind of physical harm that not only qualifies for Domestic Violence but it is abhorrent but it, also, qualifies for Felonious Assault, Count Two. Cause or attempt to cause physical harm.

(Feb. 6, 2025 Tr. at 68-69).

**{¶105}** Perdue contends that the comments made by the State are incorrect statements of law that misled the jury.

**{¶106}** However, after viewing each of the prosecutor's comments in the context of the entirety of the trial, we do not find that the remarks prejudicially affected the outcome of the trial. Importantly, our analysis assesses whether the prosecutor's comments constitute plain error. Considering the incredible strength of the State's case against Perdue we do not find the comments rise to the level of plain error. Most notably, the testimony of the victim was corroborated not only by multiple witnesses, who testified at trial, but also by the video and audio recording of the incident itself.

**{¶107}** Moreover, the jury acquitted Perdue of two of the most serious charges against him—kidnapping and one of the felonious assault counts. Notably, here Perdue contends that the prosecutor's statements with respect to the elements of kidnapping confused the jury. Yet, the jury acquitted him of that charge, indicating that the jury was not led astray by the comments to which Perdue now attempts to assign error. Furthermore, the jury acquitting Perdue of several counts also undermines Perdue's argument that the State's comments indicating that the

defense was "talking out of both sides of his mouth" prejudiced the jury against Perdue.

**{¶108}** Accordingly, we do not find that the prosecutor's statements at closing arguments constituted plain error.

**{¶109}** Perdue's fourth assignment of error is overruled.

### Fifth Assignment of Error

**Appellant was denied effective assistance of counsel when defense counsel failed to object to numerous errors at trial and failed to properly prepare for the testimony of medical professionals.**

**{¶110}** In his fifth assignment of error, Perdue argues that his trial counsel was ineffective. Specifically, Perdue claims that his trial counsel was ineffective for failing to object to alleged improper jury instruction, alleged improper statements of law, failing to subpoena records, and failing to object at various times throughout the trial. Perdue contends that his counsel's alleged failures deprived him of his constitutional right to effective trial counsel. We disagree.

*Applicable Law*

**{¶111}** "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 2020-Ohio-3072, ¶ 45 (12th Dist.). A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001),

citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic decision, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989).

{¶112} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

*Analysis*

{¶113} Perdue argues that his trial counsel was ineffective for a variety of alleged shortcomings. Perdue contends that his trial counsel did not object to an improper jury instruction, improper statement of law, and to various hearsay statements during the trial. Perdue also claims that his trial counsel was ineffective

for failing to prepare for expert witness testimony by failing to subpoena medical records. However, we find that Perdue has not demonstrated that he was denied the right to effective counsel.

{¶114} "The failure to make either the deficiency or prejudice showing defeats a claim of ineffective assistance of counsel." *State v. Artis*, 2019-Ohio-2070, ¶ 33 (3d Dist.), citing *State v. Frye*, 2015-Ohio-3012, ¶ 11 (10th Dist.), citing *Strickland*, 466 U.S. at 697. "Thus, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . If it's easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *Id.*, quoting *Strickland* at 697.

{¶115} Although Perdue identifies several alleged shortcomings, he fails to specifically identify and demonstrate how he was prejudiced by his counsel's actions. Notably, Perdue fails to argue how, but for his trial counsel's alleged error, the outcome of his trial would have been different. This is especially important considering the overwhelming evidence against him.

{¶116} With respect to his argument that his trial counsel was ineffective for failing to object to the improper jury instruction regarding the expert testimony, he contends this error "misled the jury into believing that they had heard from an expert when in fact they had not." Perdue alleges this "bolstered the credibility" of Dr. Wilkie and NP Lollini's testimony. Specifically, Perdue appears to challenge Dr.

Wilkie and NP Lollini's testimony relating to concussions and whether Bethany experienced symptoms of a concussion following the June 7, 2024 incident. However, as detailed in our discussion of Perdue's second and third assignments of error, because Perdue was acquitted of felonious assault in violation of R.C. 2903.11(A)(1) (Count One), he was not prejudiced by this alleged error.

{¶117} Furthermore, with respect to Perdue's argument that his trial counsel erred by failing to object to alleged hearsay statements, although Perdue contends that "numerous hearsay statements" were not objected to, Perdue only highlights one such instance of alleged hearsay evidence. Moreover, the decision of Perdue's trial counsel not to object to certain alleged hearsay statements could have been a strategic decision to avoid drawing attention to the statements. *See State v. Stinebaugh*, 2024-Ohio-2677, ¶ 65 (3d Dist.) ("[T]he decision not to object falls within the realm of trial strategy and does not generally constitute deficient performance."). Thus, we do not find that Perdue has established that he was prejudiced by his counsel's decision not to object to alleged hearsay statements.

{¶118} Thus, on appeal, Perdue does not demonstrate prejudice. Accordingly, Perdue has failed to carry the burden of establishing his ineffective assistance of counsel claims.

{¶119} Perdue's fifth assignment of error is overruled.

**Sixth Assignment of Error**

**Appellant was deprived of his constitutional right to due process
and a fair trial by the cumulative effect of error.**

{¶120} In his sixth assignment of error, Perdue asserts that his constitutional right to due process and a fair trial was violated by the cumulative effect of the alleged errors outlined in his first five assignments of error. We disagree.

{¶121} "In Ohio, it is generally recognized that 'given the myriad [of] safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial.'" *State v. Heath*, 2025-Ohio-996, ¶ 56 (7th Dist.), quoting *State v. Howard-Ross*, 2015-Ohio-4810, ¶ 11 (7th Dist.). "With this in mind, cumulative error exists only where errors actually 'deprive a defendant of the constitutional right to a fair trial.'" *Id.* at ¶ 57, quoting *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "The Supreme Court [of Ohio] has recognized that '"there can be no such thing as an error-free, perfect trial, and . . . the Constitution does not guarantee such a trial."'" *State v. Yatson*, 2022-Ohio-2621, ¶ 75 (9th Dist.), *State v. Hill*, 75 Ohio St.3d 195, 212 (1996), quoting *U.S. v. Hasting*, 461 U.S. 499, 508-509 (1983). Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for

reversal." *State v. Spencer*, 2015-Ohio-52, ¶ 83 (3d Dist.). "To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors." *In re J.M.*, 2012-Ohio-1467, ¶ 36 (3d Dist.).

{¶122} Thus, after reviewing the totality of the record, we do not find that there is a reasonable probability that the trial outcome would have been different but for the matters Perdue has raised on appeal or that any errors deprived Perdue of a fair trial.

{¶123} Accordingly, Perdue's sixth assignment of error is overruled.

*Conclusion*

{¶124} For the foregoing reasons, Perdue's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Union County Court of Common Pleas.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and WALDICK, J., concur.**

Case No. 14-25-15

# **<u>JUDGMENT ENTRY</u>**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. *See* App.R. 30.

                                               _____
                                               Mark C. Miller, Judge

                                             _____
                                             William R. Zimmerman, Judge

                                             _____
                                             Juergen A. Waldick, Judge

DATED:
/hls